FILED

2025 Sep-19  PM 05:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL FOSTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:22-cv-01378-MHH** |
| | } | |
| **CASEY INDUSTRIAL, INC.,** *et al.*, | } | |
| | } | |
| **Defendants.** | } | |
| | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 13, 2022, plaintiff Michael Foster filed this action in the Eastern District of Virginia against defendants Darrell Eads, Jr. and Casey Industrial Inc. The lawsuit concerns a 2021 motor vehicle collision involving Mr. Foster and Mr. Eads.  (Doc. 1).[1]  The Virginia Court transferred Mr. Foster's case to this Court, (Docs. 32, 33), and Mr. Foster amended his complaint, (Doc. 44).  The amended complaint is the operative pleading in this case.

Mr. Foster alleges that Mr. Eads is responsible for their accident because Mr. Eads negligently and wantonly operated his vehicle.  Mr. Foster suffered significant

---

[1] Mr. Foster originally named Progressive Specialty Insurance Company as a defendant, (Doc. 1), but Mr. Foster did not name the company as a defendant in the operative complaint.  (Doc. 44). Therefore, Progressive Specialty no longer is a party to this action.

injuries in the accident. (Doc. 44, pp. 5–9). Mr. Foster asserts that Casey is vicariously liable for Mr. Eads's negligent and wanton conduct under a respondeat superior theory, (Doc. 44, pp. 6–8), and that Casey is liable for its negligent hiring, training, supervision, and retention of Mr. Eads, (Doc. 44, pp. 9–10).[2]

Mr. Eads has moved for a judgment in his favor on Mr. Foster's wantonness claim. (Doc. 71).[3] Casey has moved for summary judgment on Mr. Foster's claims against the company. (Doc. 73). To resolve these motions, the Court first describes the procedural standard that governs summary judgment motions. Then, applying that standard, the Court summarizes the evidence in the summary judgment record, presenting the evidence in the light most favorable to Mr. Foster, the non-movant. Finally, the Court applies the law that governs Mr. Foster's claims to the evidence to determine whether the record contains disputed facts that a jury must resolve.

## I.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate

---

[2] Mr. Foster alleges that Casey's purported "failure to properly hire, retain, supervise, monitor, and/or train [Mr.] Eads amounted to reckless and wanton conduct." (Doc. 44, p. 10, ¶ 35).

[3] Mr. Eads did not move for summary judgment on Mr. Foster's negligence claim. (Doc. 71). Therefore, that claim will proceed to trial.

that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023).  Because Mr. Eads and Casey moved for summary judgment, in this opinion, the Court presents the evidence in the light most favorable to Mr. Foster.

## II.

Casey Industrial, Inc. is an industrial contracting company.  (Doc. 76-1, pp. 35–38).  In 2020, Casey was awarded a contract for a heat and power project for Ascend Performance Materials in Decatur, Alabama.  (Doc. 76-1, pp. 68–69, 81).  Casey hired some local employees to work on the project, but the company relied on travelling employees to provide skilled labor on the project.  (Doc. 76-1, pp. 99–100).

To attract laborers from areas beyond Decatur to work on the project, Casey offered relocation compensation and subsistence pay. (Doc. 76-1, pp. 99–100). Casey provided a one-time payment to help defray the costs associated with temporarily relocating to the project area. (Doc. 76-4, pp. 96–97; Doc. 76-5, p. 56, tp. 22–25). Casey also gave travel employees a per diem, but Casey did not tell the employees how to use their per diem payments. (Doc. 76-4, pp. 79–81). Local employees were advantageous to Casey because the company did not offer relocation compensation to local employees. (Doc. 76-1, p. 117, tp. 12–16).

In late 2020, Casey hired Mr. Eads to work as a millwright journeyman on the Ascend project. (Doc. 76-5, p. 37, tp. 11–22; Doc. 94-1, p. 2). Mr. Eads lived in Virginia; he had worked for Casey on other projects. (Doc. 76-5, pp. 10–11; Doc. 94, p. 2). Mr. Eads had a reputation for being late. Casey let him go from one project because of tardiness. (Doc. 76-15, pp. 24–25). Casey hired Mr. Eads to work on the Ascend project because Mr. Eads was a jack of all trades and helped wherever he could. (Doc. 76-5, pp. 26–27).

Per Casey policy, as a millwright journeyman, Mr. Eads had to travel "up to 90%." (Doc. 94-3, p. 4). He had to work on the project site, and Casey permitted "intermittent travel to [Mr. Eads's] residence of record." (Doc. 94-3, p. 4). As with other travel employees, Casey paid Mr. Eads a one-time payment to temporarily relocate from Virginia to Alabama. (Doc. 76-4, p. 76, tp. 3–23; Doc. 94-2, p. 2).

Mr. Eads also received an $80 per diem. (Doc. 76-5, p. 58, tp. 6–13; Doc. 94-1, p. 2). Mr. Eads used the per diem towards the cost of living, gas, rent, and groceries. (Doc. 76-5, pp. 57–58).

As a journeyman, Mr. Eads installed, removed, and moved heavy machinery and equipment on job sites. (Doc. 94-3, p. 2). Among other things, Mr. Eads operated a forklift. (Doc. 76-5, pp. 39–40). Mr. Eads and Casey's other employees on the Ascend project had to arrive at work by 7:00 AM each day. (Doc. 76-5, p. 121, tp. 14–21). At the time of the accident, Mr. Eads resided in a cabin on a campground near the Ascend jobsite. (Doc. 76-5, pp. 60–61). Mr. Eads typically left his cabin to head to the job site between 6:15 and 6:30 AM. He usually stopped to get a biscuit and a cup of coffee at a gas station along the way. (Doc. 76-5, pp. 64–65). The gas station was 9.4 miles away from the job site, an approximately eight-minute drive according to Mr. Eads. (Doc. 76-24, p. 2; Doc. 76-5, p. 65, tp. 12–15). Mr. Eads typically arrived at the job site on time if he left the gas station between 6:30 and 6:40 AM. (Doc. 76-5, p. 66, tp. 1–4).

On February 3, 2021, while he was operating a forklift on the Ascend job site, Mr. Eads struck and damaged a fire hydrant. (Doc. 76-4, pp. 140–41; Doc. 94-9, p. 2). A report from Casey's investigation of the incident indicated that Mr. Eads was distracted and "unaware of his surroundings" when drove over the fire hydrant. (Doc. 94-9, p. 2). Casey officially suspended Mr. Eads for several days, (Doc. 76-

5, p. 105, tp. 1–18), but the assistant project manager instructed him to return to the job site after his first day of suspension. (Doc. 76-5, pp. 105–06).

While he was working on the Ascend project, Mr. Eads met Amber Raschen, a Decatur resident who lived in a camper beside Mr. Eads's cabin. (Doc. 76-5, pp. 15, 76). Mr. Eads began helping Ms. Raschen; he paid her to clean his apartment and bought her clothes and food. (Doc. 76-5, p. 15, tp. 9–25). Eventually, Mr. Eads helped Ms. Raschen get a job with Casey on the Ascend project. (Doc. 76-5, pp. 15, 68). Mr. Eads told Tammy Getty, the labor foreman on the project, that Ms. Raschen would be a good employee. (Doc. 76-5, p. 68, tp. 12–19; Doc. 76-15, p. 117, tp. 11–13). On July 7, 2021, Casey hired Ms. Raschen to work on the project as a fire watch. (Doc. 94-4, p. 2; Doc. 76-15, p. 31, tp. 15–16). Ms. Getty described Ms. Raschen as hard working and a good employee. (Doc. 76-15, pp. 35–37). Ms. Raschen arrived to work on time, contributed to the project's progress, and worked well with others. (Doc. 94-5, p. 2). To help Ms. Raschen, and Casey, (Doc. 76-5, p. 146, tp. 6–10), Mr. Eads drove Ms. Raschen to work on the project most every day. (Doc. 76-5, p. 69, tp. 8–19). Ms. Getty thanked Mr. Eads for bringing Ms. Raschen to work. (Doc. 76-15, pp. 39–40).

After work on August 31, 2021, Mr. Eads and some other Casey employees got together to grill. (Doc. 76-5, p. 78, tp. 16–24). That evening, Mr. Eads drank between five and six beers and consumed a couple of shots of moonshine. (Doc. 76-

5, p. 79, tp. 11–22).  Mr. Eads stopped drinking and went to bed sometime before midnight.  (Doc. 76-5, pp. 80–81).  The following morning, Mr. Eads awoke, brushed his teeth, and waited for Ms. Raschen to arrive at his cabin.  (Doc. 76-5, p. 81, tp. 5–14).  Ms. Raschen arrived at Mr. Eads's cabin between 6:15 and 6:30 AM, and the two left for work.  (Doc. 76-5, p. 81, tp. 15–25).

As Mr. Eads and Ms. Raschen travelled southbound on County Road 400 towards the gas station where Mr. Eads got breakfast, (Doc. 76-5, pp. 81–83; Doc. 76-25, p. 4), the weather was foggy as it often was early in the morning on County Road 400.  (Doc. 76-5, pp. 87, 90).  A few miles down the road, Mr. Eads neared a stop sign at the intersection of CR-400 and Highway 20.  (Doc. 76-5, pp. 81–82, 85; Doc. 76-25, p. 4).  The gas station was across the intersection.  (Doc. 76-5, p. 82, tp. 7–11).  A median separated four lanes of traffic on Highway 20.  (Doc. 76-5, p. 85, tp. 18–20; Doc. 76-25, p. 4).  Mr. Eads knew he had to be mindful of east and westbound traffic on Highway 20.  (Doc. 76-5, pp. 84–85, 96).  Other than Ms. Raschen in the passenger seat, who was playing on her cellphone, nothing obstructed Mr. Eads's view of the roadway at the intersection.  (Doc. 76-5, pp. 92, 95).

Mr. Eads rolled through the stop sign at the intersection and continued toward the median.  (Doc. 76-19, p. 87, tp. 12–20).[4]  At the median, Mr. Eads did not see

---

[44] Mr. Eads contends that he stopped at the stop sign and allowed two cars to pass.  (Doc. 76-5, p. 87, tp. 5–9).  Mr. Foster contends that he saw Mr. Eads roll through the stop sign and continue to

traffic, so he continued across Highway 20 towards the gas station. (Doc. 76-5, p. 87, tp. 10–13). Though Mr. Eads did not see him, Mr. Foster was travelling eastbound on Highway 20. (Doc. 76-5, p. 94, tp. 4–7; Doc. 94-7, p. 11). Mr. Foster saw Mr. Eads drive through the stop sign and continue to the median, (Doc. 76-19, p. 87, tp. 12–20), but Mr. Foster assumed Mr. Eads would stop at the median, (Doc. 76-19, p. 88, tp. 2–23). Mr. Eads did not stop. As Mr. Eads entered Mr. Foster's lane of traffic, Mr. Foster attempted to brake to avoid a collision, but he did not succeed. (Doc. 76-19, p. 89, tp. 13–21). Mr. Eads's vehicle and Mr. Foster's vehicle collided at approximately 6:30 AM. (Doc. 94-7, p. 8).

Alabama State Troopers Jordan Seahorn and Brad Counce arrived at the scene and investigated the collision. (Doc. 76-25, p. 5; Doc. 94-7, p. 14). In his report, Trooper Seahorn stated that because Mr. Eads did not properly stop at the median, Mr. Foster collided with the passenger side of Mr. Eads's vehicle. (Doc. 76-25, p. 4). Trooper Seahorn noted a "strong and distinct smell of an alcoholic beverage coming from" Mr. Eads's vehicle, and Trooper Seahorn reported that "multiple open cans of beer" were thrown from Mr. Eads's vehicle and were laying along the road. (Doc. 76-25, p. 4).

---

the median. (Doc. 76-19, p. 87, tp. 12–20). For purposes of this opinion, construing the facts in a light favorable to Mr. Foster, the Court accepts Mr. Foster's version of events.

Officer Terry Gaddy and State Trooper Nicholas Brown obtained crash data from Mr. Eads's vehicle. (Doc. 94-8, p. 2). The data revealed that Mr. Eads was driving 10 miles per hour five seconds before the accident occurred and 22 miles per hour one second before the accident occurred. (Doc. 94-8, p. 4). The report also indicated that Mr. Eads applied his brakes eight seconds before the accident, but he did not reapply the brakes before colliding with Mr. Foster's vehicle. (Doc. 94-8, p. 4). This is consistent with Mr. Foster's testimony that Mr. Eads rolled through the median.

As a result of the collision, Mr. Eads suffered five broken ribs and a punctured lung and was hospitalized. (Doc. 76-5, p. 101, tp. 24–25). He was out of work for a little more than one month. (Doc. 76-5, p. 101, tp. 21–25). Ms. Raschen suffered a broken collar bone and did not return to work. (Doc. 76-23, p. 11; Doc. 76-15, pp. 44–45). Mr. Foster was hospitalized for an extended period, (Doc. 76-19, tp. 114, tp. 16–19), and then moved to an in-patient rehabilitation facility, (Doc. 76-19, p. 115, tp. 1–11). Mr. Foster has had to use a wheelchair since the accident. (Doc. 76-19, pp. 131–33).

## III.

Mr. Eads argues that he is entitled to summary judgment on Mr. Foster's wantonness claim. (Doc. 71, p. 7). Under Alabama law, wantonness is "'the conscious doing of some act or the omission of some duty while knowing the

9

existence of the conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'"  *Thomas v. Heard*, 256 So. 3d 644, 655–56 (Ala. 2017) (quoting *Ex parte Essary*, 992 So. 2d 5, 9–10 (Ala. 2007)) (finding an individual who drank alcohol and took prescription medication that caused drowsiness wantonly operated a vehicle because the combination of substances prevented the individual from being conscious of the risk of harm posed). An individual becomes conscious that injury will likely or probably result by "perceiving, apprehending, or noticing with a degree of controlled thought or observation."  *Thomas*, 256 So. 3d at 656 (quoting *Essary*, 992 So. 2d at 9–10).  In *Essary*, the Alabama Supreme Court explained:

> " ' " 'Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury ....
>
> " ' " 'Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as ... a conscious ... act. "Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted." *McNeil v. Munson S.S. Lines*, 184 Ala. 420, [423], 63 So. 992 (1913)....' " '

*Essary*, 992 So. 2d at 9–10 (citing *Tolbert v. Tolbert*, 903 So. 2d 103, 114–15 (Ala. 2004)).  "The determination of whether a defendant's acts constitute wanton conduct

depends on the facts in each particular case." *Essary*, 992 So. 2d at 10 (citing *Ex parte Anderson*, 682 So. 2d 467, 470 (Ala. 1996)).

In *Essary*, as Mr. Essary was driving on a state highway that he frequently travelled, he failed to stop at an intersection to look for oncoming traffic. 992 So. 2d at 7, 10. Mr. Essary rolled through the stop sign at the intersection and collided with another vehicle. *Essary*, 992 So. 2d at 12. Mr. Essary testified that he did not see oncoming traffic; the driver of the other vehicle testified that he saw Mr. Essary roll through the stop sign. *Essary*, 992 So. 2d at 11. In determining whether Mr. Essary's conduct was wanton, the Alabama Supreme Court stated:

> Although the evidence indicates that Essary knowingly entered the intersection, there is nothing from which the trier of fact could infer that, in moving his vehicle through the intersection, Essary's state of mind contained the requisite consciousness, awareness, or perception that injury was likely to, or would probably result. Indeed, the risk of injury to Essary himself was as real as any risk of injury to the plaintiffs. Absent some evidence of impaired judgment, such as from the consumption of alcohol, we do not expect an individual to engage in self-destructive behavior. *See Griffin Lumber Co. v. Harper*, 252 Ala. 93, 95, 39 So. 2d 399, 401 (1949) ("There is a rebuttable presumption recognized by the law that every person in possession of his normal faculties in a situation known to be dangerous to himself, will give heed to instincts of safety and self-preservation to exercise ordinary care for his own personal protection. It is founded on a law of nature and has [as] its motive the fear of pain or death. *Atlantic Coast Line R. Co. v. Wetherington*, 245 Ala. 313(9), 16 So. 2d 720 [(1944)]").

*Essary*, 992 So. 2d at 12 (brackets in *Essary*).

In reaching its decision, the Alabama Supreme Court distinguished the facts in *Essary* from those in *Clark v. Black*, 630 So. 2d 1012 (Ala. 1993). In *Clark*, the

Alabama Supreme Court reversed a judgment in favor of the defendant on the plaintiffs' wantonness claim and held that a driver who was travelling at a high rate of speed and who failed to stop at a stop, knowing that his view was obstructed, was wanton. *Clark*, 630 So. 2d at 1013–14; *see also Essary*, 992 So. 2d at 13. In distinguishing the facts in *Essary* from the facts in *Clark*, the Alabama Supreme Court stated:

> The evidence in *Clark* indicated that the defendant knew of a particular danger at the intersection, that she was traveling at a high rate of speed, and that she ignored a stop sign. No such set of circumstances exist here. There is no evidence indicating that Essary was aware of any particular danger at the intersection . . ., and he did not speed through the intersection while ignoring the stop sign. Instead, [the plaintiff's] testimony shows that when Essary reached the intersection, he slowed and made a rolling stop.

*Essary*, 992 So. 2d at 13. The Alabama Supreme Court determined that Mr. Essary was not wanton. *Essary*, 992 So. 2d at 13.

In *Mandella v. Pennington*, 73 So. 3d 1257 (Ala. Civ. App. 2011), the Alabama Court of Civil Appeals applied *Essary* and determined that an individual who tried unsuccessfully to beat oncoming traffic at an intersection was not wanton. *Mandella*, 73 So. 3d at 1266. The Alabama Court of Civil Appeals held that the record contained no evidence of aggravating circumstances such as intoxication and no other evidence "indicating that he was conscious that harm would likely or probably result from his attempting to beat the traffic." *Mandella*, 73 So. 3d at 1266.

Viewed in the light most favorable to Mr. Foster, the facts in this case align with the facts in *Essary* and *Mandella*.  (Doc. 78, pp. 9–10).  Like the driver in *Essary*, Mr. Eads was familiar with this intersection; it was part of his daily route from his cabin to Casey's construction site.  Like the driver in *Essary*, Mr. Eads rolled through a stop sign and then proceeded through the median of a four-lane highway without stopping for traffic.[5]  Like the driver in *Essary*, Mr. Eads had an unobstructed view of the roadway, but he did not see Mr. Foster's car, so he continued through the median.

Here, though Mr. Eads understood generally that he had to be mindful of east and westbound traffic on Highway 20, as in *Essary*, "[t]here is no evidence indicating that [Mr. Eads] was aware of any particular danger" as he crossed the median in Highway 20.  *Essary*, 992 So. 2d at 13.  Though Mr. Eads's speed had increased from 10 miles per hour five seconds before the accident to 22 miles per hour one second before the accident, there is no evidence that he was trying to speed through the median to get to the gas station across the highway.  Even if Mr. Eads had been trying to beat traffic, *Mandella* instructs that doing so will not support a wantonness claim under Alabama law unless there is evidence that the driver who

---

[5] Mr. Foster contends that Mr. Eads "blew through the stop sign," but the record does not support that contention.  (*See, e.g.*, Doc. 94-8, p. 4).  In any event, Mr. Foster and Mr. Eads collided at the median, and Mr. Eads was travelling 10 miles per hour in the median and 22 miles per hour one second before the collision.

violated a rule of the road was conscious of the risk of harm or injury that "would likely or probably result from his attempt to beat the traffic." *Mandella*, 73 So. 3d at 1266. The uncontradicted evidence here is that Mr. Eads did not see Mr. Foster's vehicle as he accelerated moderately through the median. There is no evidence that Mr. Eads had a conscious risk of the harm that probably would result from his crossing the median without first coming to a complete stop. *See Mandella*, 73 So. 3d at 1266; *see also Essary*, 992 So. 2d at 12.

Mr. Foster has not rebutted the general presumption that individuals do not engage in self-destructive behavior. *See Essary*, 992 So. 2d at 12. Though it is undisputed that Mr. Eads drank five or six beers and consumed shots of moonshine the night before the accident, that he had beer cans in his truck, and that Trooper Seahorn noted the smell of alcohol coming from Mr. Eads's vehicle at the accident scene, the record does not indicate that Mr. Eads was issued a traffic citation, arrested, or indicted for driving under the influence or that Mr. Eads was impaired at the time of the collision. There is no evidence from Mr. Eads's hospital admission that he was impaired at the time of the accident. Ms. Raschen accepted a ride to work from Mr. Eads. Presumably, her instinct for self-preservation would have caused her to decline a ride if Mr. Eads exhibited signs of impairment. Because he has not presented evidence of aggravating circumstances, Mr. Foster cannot

14

overcome the presumption that Mr. Eads did not abandon his instincts for safety and self-preservation. *See Essary*, 992 So. 2d at 12.

For these reasons, the Court grants Mr. Eads's motion for summary judgment on Mr. Foster's wantonness claim.[6]

## IV.

Casey argues that it is entitled to summary judgment on Mr. Foster's claims. First, Casey Argues that it cannot be vicariously liable for Mr. Eads's actions because Mr. Eads was not acting within the line and scope of his employment at the time of the collision. (Doc. 74, p. 8). Next, Casey argues that Mr. Foster's negligent hiring, training, supervision, and retention claim fails as a matter of law. (Doc. 74, p. 19). The Court addresses each argument in turn.

### *Respondeat Superior*

Under Alabama law, an employer may be vicariously liable for the acts of its employees if those acts were done for the employer's benefit under certain circumstances. *Madasu v. Shoals Radiology Assocs., P.C.*, 378 So. 3d 501, 505 (Ala. 2022) (quoting *Cobbs, Allen & Hall, Inc. v. EPIC Holdings, Inc.*, 335 So. 3d 1115, 1138 (Ala. 2021)). An employer is not vicariously liable if the employee is impelled by "'motives that had nothing to do with [the employee's] duties' to his employer."

---

[6] In the absence of a wantonness claim, under Alabama law, there is no basis for an award of punitive damages against Mr. Eads. Therefore, Mr. Eads's motion to strike those damages is moot.

*Madasu*, 378 So. 3d at 505 (quoting *Cobbs*, 335 So. 3d at 1140) (brackets in *Cobbs*). "That is true even if the employee's independent pursuits happened to confer an unintended or incidental benefit on his employer." *Madasu*, 378 So. 3d at 505 (citing *East Ala. Behav. Med., P.C. v. Chancey*, 883 So. 2d 162, 168 (Ala. 2003)). Conversely, when an employee's acts are not wholly personal, and the employee intends to promote the business of his employment, an employer may be vicariously liable for the employee's actions. *Solmica of Gulf Coast, Inc. v. Braggs*, 285 Ala. 396, 642–43 (Ala. 1970) ("The conduct of the employee, to come within the rule, must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment.").

Although not cited in the parties' briefs, the Court finds the Alabama Supreme Court's analysis in *Madasu* instructive. In *Madasu*, the plaintiff brought a medical malpractice claim against a radiologist who misread her CT scans. 378 So. 3d at 503. Because of the radiologist's error, the plaintiff suffered a seizure and became paralyzed. *Madasu*, 378 So. 3d at 503. The plaintiff sued the two medical practice groups with which the radiologist worked, Lauderdale Radiology Group and Shoals Radiology Associates, P.C. *Madasu*, 378 So. 3d at 503. The radiologist worked under contract for both practice groups, though Shoals expressly precluded its physicians from working for other providers without written approval. *Madasu*, 378

So. 3d at 503. At the time he read the scans, the radiologist was working for Lauderdale without Shoals's written approval. *Madasu*, 378 So. 3d at 504. The Alabama Supreme Court considered whether Shoals could be vicariously liable for the radiologist's actions under the doctrine of respondeat superior. *Madasu*, 378 So. 3d at 504.

In deciding the issue, the Alabama Supreme Court explained that an employer may be vicariously liable for an employee's wrongful acts if the employee's actions are within the line and scope of his employment or if the acts are done in furtherance of the employer's business. *Madasu*, 378 So. 3d at 505 (quoting *Cobbs*, 335 So. 3d at 1138). The Alabama Supreme Court noted that the Alabama Court of Civil Appeals had recognized that the "or" language creates two avenues to establish respondeat superior liability, *Madasu*, 378 So. 3d at 505–06 n.3, but in many opinions, including *Cobbs*, Alabama's appellate courts "described the furtherance-of-business inquiry as a component of the line-and-scope test, rather than as a separate basis for vicarious liability." *Madasu*, 378 So. 3d at 505–06 n.3; *see also Cobbs*, 335, So. 3d at 1139 ("The rule . . . for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the

17

scope of employment (quoting *Hulbert v. State Farm Mut. Auto Ins. Co.*, 723 So. 2d 22, 23 (Ala. 1998) (alteration in *Cobbs*)).

Without resolving the meaning of "or" in the context of vicarious liability, the Alabama Supreme Court recognized that, under either view of the test, an employee must, at the very least, act "with an intention to serve 'the master's business,' rather than acting on wholly independent motives." *Madasu*, 378 So. 3d at 505–06 (quoting *East Ala.*, 883 So. 2d 168). The Alabama Supreme Court explained that "the furtherance-of-business test is a subjective test, not an objective one." *Madasu*, 378 So. 3d at 506. An employee acts "to 'benefit his employer' for purposes of respondeat superior" when the "employee posse[sses] the 'intention to perform' the action 'as a part of or incident to a service on account of which he [wa]s employed.'" *Madasu*, 378 So. 3d at 506 (quoting 1 Restatement (Second) of Agency § 235 (Am. L. Ins. 1958)) (first set of brackets added; second set of brackets in *Madasu*).

The Alabama Supreme Court determined that Shoals was not vicariously liable for the radiologist's erroneous reading because nothing in the record suggested that the radiologist intended to benefit Shoals when he read the scans. *Madasu*, 378 So. 3d at 507–08. The Alabama Supreme Court noted that Shoals was not paying the radiologist, and the radiologist was not treating Shoals's patients or helping Shoals's clients, was not working under the direction of Shoals employees,

and was not on Shoals's property when he read the scans. *Madasu*, 378 So. 3d at 506–07.

Here, Casey argues that it is not vicariously liable for Mr. Eads's conduct leading to the collision because Mr. Eads was not acting within the line and scope of his employment when the collision occurred. As Casey argues, under Alabama law, "an employee using an automobile, whether belonging to his master or to himself, in going to and from his place of work, is not at such times regarded as engaged in work for his master but is acting solely for his own purposes." *Smith v. Brown-Service Ins. Co.*, 35 So. 2d 490, 493 (Ala. 1948) (collecting cases), but this does not address the employee's subjective intent as *Madasu* requires. *Madasu* asks whether Mr. Eads intended to benefit Casey as he drove to work on the morning of the accident.

The evidence establishes that Casey had to hire out-of-sate laborers like Mr. Eads for its Decatur jobsite, and Casey encouraged its employees to identify potential employees who lived in Decatur for whom Casey did not incur the expense of per diem allowances. To further Casey's interests, Mr. Eads recruited Ms. Raschen, a local resident, to work on the Ascend project. Mr. Eads gave Ms. Raschen a ride to Casey's Decatur facility almost every day. Mr. Eads testified that he believed that he was helping Casey by driving Ms. Raschen to work. Ms. Getty,

one of Casey's foremen, thanked Mr. Eads for transporting Ms. Raschen to and from work.

Based on these facts, a reasonable jury could find that, at the time of the accident, Mr. Eads was purposefully conferring a benefit on Casey by driving Ms. Raschen to work, meaning that under Alabama law, he was acting within the line and scope of his employment at the time of the collision. Therefore, a jury must determine whether Casey is vicariously liable for Mr. Eads's acts that caused the collision. The Court denies Casey's motion for summary judgment as to Mr. Foster's vicarious liability claim against the company for Mr. Eads's alleged negligence.[7]

*Negligent Hiring, Training, Supervision, and Retention*

Mr. Foster maintains that Casey negligently hired, trained, supervised, and retained Mr. Eads. Under Alabama law, "[i]n the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him." *Armstrong Business Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001). "It is not sufficient merely to allege, or to show, that the employee acted

---

[7] Because the Court grants Mr. Eads's motion for summary judgment on Mr. Foster's wantonness claim, Mr. Foster's vicarious liability claim against Casey for Mr. Eads's alleged wanton conduct necessarily fails. *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824–25 (Ala. 1999).

incompetently." *Southland Bank v. A & A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1216 (Ala. 2008). "Incompetency, as related to the law of negligence, connotes *'want of ability suitable to the task, either as regards natural qualities of experience, or deficiency of disposition to use one's abilities and experience properly.* Incompetency connotes the converse of reliability. The term may include something more than physical and mental attributes; it may include want of qualification generally such as habitual carelessness, disposition, and temperament.'" *Southland Bank*, 21 So. 3d at 1215 (quoting *Joyner v. B&P Pest Control, Inc.*, 853 So. 2d 991, 999 (Ala. Civ. App. 2002)) (italics in *Joyner*). "A mistake or single act of negligence on part of the employee does not establish incompetency: Negligence is not synonymous with incompetency. The most competent may be negligent." *Southland Bank*, 21 So. 3d at 1216 (internal quotation omitted).

Once incompetency is established, "[a] plaintiff must establish 'by affirmative proof' that the employer actually knew of the incompetence, or that the employer reasonably should have known of it." *Southland Bank*, 21 So. 3d at 1216 (quoting *Lane v. Central Bank*, 425 So. 2d 1098, 1100 (Ala. 1983)) (brackets added). A plaintiff satisfies this burden by showing "either that he informed the employer about specific misdeeds of the employee, or that the employee's misdeeds were 'of such nature, character, and frequency that the master, in the exercise of due care, must

have had them brought to his notice.'" *Southland Bank*, 21 So. 3d at 1216 (quoting

*Lane*, 425 So. 2d at 1100).

Here, Mr. Foster's negligent hiring, training, supervision, and retention claim

fails because the record does not support a finding that Mr. Eads was incompetent.

Mr. Foster relies on the fact that Mr. Eads was regularly late for work and that Mr.

Eads had been out drinking the night before the wreck. (Doc. 77, pp. 12–13).

Tardiness for work does not render Mr. Eads incompetent to safely operate a vehicle.

*See Southland Bank*, 21 So. 3d at 1215. Similarly, Mr. Eads's alcohol consumption

the night before the accident does not suggest incompetence in light of the other

summary judgment evidence. Before his accident with Mr. Foster, Mr. Eads had

been involved in only one car wreck, and he had never received a DUI. (Doc. 76-5,

p. 46–48). Mr. Eads's Virginia Department of Motor Vehicle Records indicate that

he had not received a traffic citation in any state in the ten years before the accident.

(Doc. 72-1). Mr. Eads's reprimand from improperly operating a forklift does not

show that he was incompetent to drive to work because he had worked for Casey on

numerous job sites without incident. *See Southland Bank*, 21 So. 3d at 1216. Again,

even if Mr. Eads was negligent at the time of the collision, "[n]egligence is not

synonymous with incompetency." *Southland Bank*, 21 So. 3d at 1216. Therefore,

Mr. Foster has not provided substantial evidence to support his negligent hiring,

training, supervision, and retention claim.    Accordingly, Casey is entitled to summary judgment on that claim.[8]

### V.

For these reasons, the Court grants Mr. Eads's motion for partial summary judgment on Mr. Foster's wantonness claim.  The Court grants in part and denies in part Casey's motion for summary judgment.  The Clerk of Court shall please TERM Docs. 71 and 73.

By separate order, the Court will set this matter for a telephone conference on October 7, 2025, at 3:00 p.m. to select a trial date.

**DONE** and **ORDERED** this September 19, 2025.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[8] The burden of proof in this diversity action "is a substantive issue and is therefore controlled by state law."  *Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 491 (11th Cir. 1990) (citations omitted).  In Alabama, "proof by substantial evidence shall be required to submit an issue of fact to the trier of the facts."  ALA. CODE § 12-21-12(a).  "Substantial evidence" means "evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven."  ALA. CODE § 12-21-12(d).